IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTINE FLORES,

    Plaintiff,                                    No. CIV S-07-0923 EFB

    vs.

MICHAEL J. ASTRUE,                    <u>ORDER</u>
Commissioner of Social Security,

    Defendant.
_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment is denied. This case is remanded for immediate payment of benefits, and the Clerk is directed to enter judgment for plaintiff.

**I. BACKGROUND**

      Plaintiff, born June 25, 1950, applied for disability on July 27, 2000, alleging disability since March 13, 2000, due to heart attack, and three open heart surgeries. Administrative Record ("AR") 91-93, 122. Plaintiff worked for twenty-three years as a medical equipment sterilizer, and was unable to return to the job following a heart attack on March 13, 2000. AR 122-23, 536.

Plaintiff's application for benefits was denied initially and upon reconsideration. AR 71-81.

A hearing was held before administrative law judge ("ALJ") Daniel G. Heely, and on February 22, 2002, he found plaintiff not disabled.[1] AR 306-14. On January 14, 2003, the Appeals Council remanded the case, directing the ALJ to reconsider the medical opinions in the record and plaintiff's maximum residual functional capacity during the entire period at issue, to obtain evidence from a medical expert to clarify the nature and severity of her cardiac impairments, and to obtain vocational evidence. AR 324-28.

In a new decision, dated January 21, 2004, the ALJ found that plaintiff was entitled to a period of disability and disability insurance benefits as of April 1, 2002. AR 53-59. Prior to that

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401, *et seq*. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382, *et seq*. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) and 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

2

date, he found that although plaintiff was "unable to perform the full range of sedentary work, she was capable of making an adjustment to work that exists in significant numbers in the national economy." AR 59. Using the Medical Vocational Guidelines ("grids") as framework, particularly Rules 201.28 and 201.29, he determined that a finding of "not disabled" was directed. AR 58-59; 20 C.F.R., Part 404, Subpt. P, App. 2.

Following this decision, plaintiff's counsel advised the ALJ that the cited grid rules apply to "younger individuals" aged 18-44, and that his decision incorrectly cited plaintiff's age. In light of plaintiff's alleged date of onset of disability and her birth date, she was at the relevant time, in fact, between the ages of 50-54, which the regulations define as an "individual closely approaching advanced age." AR 31-32; *see* 20 C.F.R., Part 404, Subpt. P, App. 2, Rule 201.00(g).

On February 19, 2004, the ALJ issued an amended decision, in which he corrected plaintiff's age, but then altered the functional capacity finding so as to fall under the "light" table of the grids rather than the "sedentary" table. He then found that although plaintiff "was unable to perform the full range of *light* work, she was capable of making an adjustment to work that exists in significant numbers in the national economy." AR 47 (emphasis added). Citing the vocational expert's testimony and Rule 202.14 of the grids as a framework, he again found that plaintiff not disabled prior to April 1, 2002.[2] *Id.* His specific findings were as follows:

> 1. The claimant met the disability insured status requirements of the Act on May 15, 2000, the date the claimant stated she became unable to work. She has acquired sufficient quarters of coverage to remain insured through at least December 31, 2004.
>
> 2. The claimant has not engaged in substantial gainful activity since her alleged onset date.
>
> 3. The medical evidence establishes that the claimant is status post a triple vessel coronary artery bypass graft and has

---

[2] Rule 202.00 concerns individuals whose residual functional capacity is limited to "light work." 20 C.F.R., Part 404, Subpt. P, App. 2, Rule 202.00, Table No. 2.

3

        angina, hyperlipidemia and mild congestive heart failure that are severe. None of her impairments met or equaled the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 before April 1, 2002.

4. The claimant's statements concerning her impairments and their impact on her ability to work before April 1, 2002 are not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports.

5. Before April 1, 2002, the claimant retained the residual functional capacity to lift and carry 10 pounds occasionally. She could sit, stand or walk for six hours each in an eight-hour workday. She required a sit/stand option, but could sit for up to one hour at a time. She could stand and/or walk for six hours, but her walking would be limited to two blocks at a time. The claimant experienced depression that caused no restrictions of her activities of daily living and no difficulties maintaining social functioning. She had mild deficiencies of concentration, persistence or pace, and there is no indication that she had an episode of decompensation. The claimant retained the understanding and memory, sustained concentration and persistence, social interaction and adaptation skills necessary to engage in substantial gainful activity.

6. The claimant cannot return to her past work as a medical equipment sterilizer.

7. The claimant is 53 years old, a [*sic*] individual who is "closely approaching advanced age" with a high school education and a semi-skilled work experience.

8. Based on an exertional capacity for light work, and the claimant's age, educational background, and work experience, Section 416.969 and rule 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

9. Although the claimant was unable to perform the full range of light work, she was capable of making an adjustment to work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore reached within the framework of the above-cited rule and the testimony of the vocational expert.

10. At no time before January 17, 1997 did the claimant's limitations prevent her from performing work that exists in significant numbers in the national economy.

| | | |
|---|---|---|
| 11. | | The claimant was not under a disability, as defined in the Social Security Act, at any time before April 1, 2002. |
| 12. | | As of April 1, 2002, the claimant's medical condition has worsened. It now equals the requirements of Listing 4.04A(5). She has been disabled under the Act since April 1, 2002. |

AR 41-48.

On March 15, 2007, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. AR 5-7.

**II. ISSUES PRESENTED**

In her motion for summary judgment, plaintiff alleges three errors in the Commissioner's decision. First, plaintiff alleges that the ALJ failed to provide clear and convincing reasons for rejecting the opinion of her treating cardiologist, Dr. M. Thabet Karabala, M.D. Second, she alleges that the plaintiff's residual functional capacity ("RFC") assessment is not based on substantial evidence. Finally, plaintiff alleges that the ALJ did not properly evaluate her subjective complaints.

**III. LEGAL STANDARDS**

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## IV. ANALYSIS

Plaintiff alleges that the ALJ erred by failing to credit the opinion of her treating cardiologist, Dr. Karabala, who opined that she was capable of only sedentary work during the period at issue – March 13, 2000 (the alleged onset date) through April 1, 2002 (the date the ALJ determined plaintiff's heart impairment met listing level severity).

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id*.; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. By contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons, that are supported by substantial evidence. *Id*., at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews*, 53 F.3d at 1041 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

////

On January 16, 2001, Dr. Karabala completed a medical source statement, in which he opined that plaintiff could frequently lift ten pounds, and could only stand and/or walk for two to four hours during an eight-hour workday.[3] AR 189.  Dr. Karabala indicated that these restrictions began on March 13, 2000 – the date of plaintiff's heart attack – and were permanent. AR 190.

The ALJ did not acknowledge Dr. Karabala by name, nor did he acknowledge his specialty, but he did review his opinion. AR 44. The ALJ indicated that he gave "great[] weight to this opinion" but believed "that the claimant's activities of daily living show that she could have stood and/or walked for more than two to four hours in an eight-hour workday." *Id*. The ALJ ultimately concluded that plaintiff could stand and/or walk for six hours during an eight-hour workday, but was limited to walking two blocks at a time. AR 45.

The ALJ's reason for rejecting Dr. Karabala's opinion regarding plaintiff's ability to stand and/or walk during an eight-hour workday is neither clear nor convincing. First, plaintiff's daily activities do not indicate an ability to walk and/or stand for six or more hours during an eight hour workday. In a daily activities questionnaire completed by plaintiff on January 15, 2001, she indicated that she tired easily with exertion and had to take frequent rests when doing chores or completing her therapeutic walk. AR 101-04. She indicated that during her walk, she would become tired and short of breath, and would need to take frequent fifteen to twenty minute breaks. She also reported that her knees and legs would stiffen and ache during the walk, and that she had to take a half-hour nap afterwards. AR 101-104. With regard to her chores, she reported that she required assistance with vacuuming, picking up heavy bags and hanging clothes on the line. AR 103. She also stated that she had to stop and rest for ten to fifteen minutes while doing any kind of chore. *Id.*

////

---

[3] Inexplicably, the ALJ wrote that this was an "undated" medical source statement. AR 44.

Significantly, plaintiff's 2001 report regarding her daily activities was essentially the same as the questionnaire she completed in September 2002 – five months after the date the ALJ determined plaintiff became disabled. AR 341-43. In the 2002 questionnaire, plaintiff indicated that she still walked, but that it made her tired and short of breath, that her chores took her a long time to complete, and that she took a forty-five minute nap every day. *Id.* Plaintiff testified at the October 2001, hearing that she used to be active, but that her heart condition slowed her down significantly. She testified that she could lift and carry only about 10 pounds, and that she tired after about five to ten minutes of doing chores. She also testified that she had to leave a friend's wedding early due to fatigue. AR 500-504. These activities in no way contradict Dr. Karabala's assessment that she could sit for an unlimited amount of time, but could stand and/or walk for no more than two to four hours in an eight-hour workday.

Further, although the ALJ noted that Dr. Karabala was plaintiff's "treating physician," he failed to consider Dr. Karabala's relationship to plaintiff, namely, that he was her treating cardiologist from the time of her bypass in March 2000 until after she became "disabled" in the spring of 2002. Dr. Karabala saw her dozens of times during that period. AR 191-94, 197-201, 297-298, 300, 350-60. In its remand order, the Appeals Council expressly directed the ALJ to reconsider Dr. Karabala's opinion, together with the nature of the treating relationship, the length of that relationship, and the frequency of examination. AR 325-26. The ALJ failed to address those factors, and instead adopted the findings of a medical expert who had no occasion to examine plaintiff. AR 45.

Moreover, the ALJ mischaracterized the results of tests performed, or ordered, by Dr. Karabala following plaintiff's surgery. The ALJ briefly discussed these tests, commenting that "[s]he did well after the surgery. . . , although a Doppler study showed a trace of regurgitation of her mitral flow . . . and an x-ray was suspicious for a small left pleural effusion." AR 43. In fact, the Doppler studies revealed "abnormal results" in both April and December of 2000. AR 198, 301. On both occasions, Dr. Karabala noted "severe global left ventricular hypokenisia,"

8

and reduced flow and regurgitation.[4] *Id.*

Further, the ALJ's comments that an "exercise echocardiogram was 'essentially negative,'" ignored the fact that the test was stopped due to plaintiff's "fatigue and ventricular irritability with frequent PVCs. . . ."[5] AR 196. While Dr. Karabala did indicate that the June 5, 2000, test was "essentially negative," he noted severe hypokinesia in the posterior and inferior walls, septal and apical akinesia,[6] and underlying ischemic cardiomyopathy.[7] *Id.*

The ALJ also wrote that one "x-ray revealed that the claimant's chest was 'stable'" and "[o]ther x-rays revealed a 'minimal' congestive pattern and 'mild' vascular congestion." AR 43. Those x-rays were taken immediately following plaintiff's bypass surgery, prior to her discharge from the hospital, and were monitoring the success of the operation, rather than her continued ability to function outside the hospital, let alone in a work environment. AR 176-79. Likewise, the ALJ's comment that the plaintiff "was encouraged to exercise," refers to a form letter sent a month after plaintiff's surgery by the hospital's cardiac rehabilitation program director. In it, the director makes several generalized comments about the benefits of exercise. AR 43, 134.

The misunderstanding or mischaracterization of these records undermines the ALJ's rejection of Dr. Karabala's opinion regarding plaintiff's ability to stand and/or walk for more than two to four hours during a workday. The record shows that Dr. Karabala's opinion was informed by intensive testing and monitoring following plaintiff's surgery. By contrast, the only other opinions in the record are by non-examining sources, and a single examining consultant.

---

[4] Hypokinesia means "abnormally decreased motor function or activity." *See* Dorland's Illustrated Medical Dictionary, 805 (27th ed. 1988).

[5] "PVC" stands for premature ventricular contraction, meaning irregular heart palpitations. *See* The Merck Manual of Diagnosis and Therapy ("Merck Manual"), 705 (18th ed. 2006).

[6] "Akinesia" means an "absence or poverty of movements." *See* Dorland's, 41.

[7] Ischemic cardiomyopathy is heart disease characterized by low cardiac output and persistent heart failure. *See* Merck Manual, 635-36.

1  *See* AR 237-41 (examining consultant, Dr. Jay Dhiman, M.D., opining that plaintiff could lift up
2  to twenty pounds frequently, and stand and walk for about six hours); AR 250-57 (state agency
3  consultant, Dr. Patrick G. Bianchi, M.D., opining that plaintiff could lift twenty pounds
4  occasionally and stand/walk for about six hours); AR 242-249 (state agency consultant, Dr.
5  Thien Nguyen, M.D., opining that plaintiff could only stand or walk for two hours per day).

6  Finally, as noted above, the ALJ adopted the findings of non-examining, testifying
7  medical expert, Dr. David A. West, M.D.  AR 45, 519-34.  However, the ALJ does not
8  accurately characterize Dr. West's testimony, writing that he opined that plaintiff could walk
9  "stand and/or walk for six hours."  AR 45.  In fact, Dr. West testified that plaintiff could only
10 walk two blocks at a time before needing to rest, and that she could "stand" for six hours with a
11 sit-stand option.  AR 534.  He never testified that she could walk for a total of six hours in an
12 eight-hour workday.

13 Based on the foregoing, the court finds that the ALJ erred by failing to credit fully Dr.
14 Karabala's opinion, which was supported by substantial evidence, and was based on his
15 treatment of plaintiff's heart impairment over a substantial period of time.  Plaintiff's daily
16 activities were not at all inconsistent with the limitations opined by Dr. Karabala, and thus did
17 not constitute "clear and convincing reasons" for rejecting Dr. Karabala's opinion.

18 Where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating
19 or examining physician, [the court] credit[s] that opinion as a matter of law." *Lester*, 81 F.3d at
20 834.  The remaining question is whether to remand the case to the ALJ, or to remand for the
21 payment of benefits.  "The decision whether to remand the case for additional evidence or
22 simply to award benefits is within the discretion of the court." *Stone v. Heckler*, 761 F.2d 530,
23 533 (9th Cir. 1985).  Generally, the court will direct the award of benefits "in cases where no
24 useful purpose would be served by further administrative proceedings or where the record has
25 been thoroughly developed." *Varney v. Secretary of Health and Human Services*, 859 F.2d
26 1396, 1399 (9th Cir. 1987).

Here, the crediting of Dr. Karabala's opinion limits plaintiff to sedentary work. The regulations define "sedentary work" as that which involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary requirements are met." 20 C.F.R. § 404.1567(a).

By contrast, light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing . . . ." 20 C.F.R. § 404.1567(b). Importantly, the regulations require that, "[t]o be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id*.

Dr. Karabala opined no limitations in plaintiff's ability to sit during an eight-hour workday, but concluded that she could lift no more than ten pounds, and could walk and/or stand for no more than two to four hours. AR 189. Dr. Karabala's opinion clearly limited plaintiff to sedentary work. *Id.*

Notably, in the ALJ's January 2004, decision, he determined that plaintiff was capable of performing only a *limited range sedentary* work. AR 59 (emphasis added). He found that plaintiff was unable to perform even a full range of sedentary work, and was unable to do her past work as a medical equipment sterilizer because "the job required light exertion." AR 59. After plaintiff's counsel advised the ALJ that he had incorrectly calculated plaintiff's age, the ALJ amended his decision to find plaintiff capable of performing *a limited range of light work*. AR 31-32, 46-47 (emphasis added). He provided no reason for this change in such a crucial finding.

Here, crediting Dr. Karabala's opinion as a matter of law establishes that plaintiff is limited to sedentary work and is therefore disabled. Even if plaintiff could do a full range of sedentary work – which the ALJ originally found her incapable of – Rule 201.14 of the grids

11

would direct a finding of disabled. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1. In light of the foregoing, further development of the record would serve no meaningful purpose. The court therefore declines to reach plaintiff's other assertions of error, and orders this case remanded for payment of benefits for the period at issue.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for immediate payment of benefits.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted.

2. The Commissioner's cross-motion for summary judgment is denied; and,

3. This action is remanded to the Commissioner for immediate payment of benefits.

DATED: September 11, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE